979 So.2d 285 (2008)
MASTEC, INC., Appellant,
v.
TJS, LLC, and Lakeland Granite and Marble, Inc., Appellees.
No. 2D06-5675.
District Court of Appeal of Florida, Second District.
February 27, 2008.
Rehearing Denied April 29, 2008.
*286 Erik W. Scharf of Erik W. Scharf, P.A., Coconut Creek, for Appellant.
Monterey Campbell, Mark N. Miller, and Kristie Hatcher-Bolin of GrayRobinson, P.A., Lakeland, for Appellees.
WALLACE, Judge.
MasTec, Inc. (the Seller) appeals a final judgment for the specific performance of a contract for the sale of a reclaimed phosphate mine to TJS, LLC, and Lakeland Granite and Marble, Inc. (collectively, the Buyers). The Buyers failed to tender the purchase price to the Seller before the contract expired, and a tender in accordance with the contract was not excused. For this reason, we reverse the final judgment for specific performance.

The Facts
On March 5, 2003, the Seller entered into a "Vacant Land Contract" (the Contract) with Lakeland Granite and Marble, Inc.[1] The Contract was for the sale of approximately 475 acres located on State Road 540 in Polk County. The purchase price was $475,000 or $1000 per acre as shown by a survey that was to be prepared before closing. The closing agent held a $10,000 deposit, and the balance of the purchase price was payable at closing. With respect to the closing date, the Contract provided, in pertinent part: "This Contract will be closed and the deed and possession delivered on or before July 25, 2003, unless extended by other provisions of this Contract."
Later, Lakeland Granite made a partial assignment of the Contract to TJS, LLC. In accordance with the assignment, TJS was to take title to 353 acres of the property at closing, and Lakeland Granite would take title to 125 acres.[2] The Seller eventually approved the assignment.
Several provisions of the Contract are noteworthy. The Contract provided that time was of the essence for all of its provisions.[3] Under paragraph 5(c) of the Contract, the Seller agreed to provide the Buyers with a title insurance commitment as title evidence. The title insurance commitment was required to conform to the requirements of paragraph 8(a) of the Contract. With respect to title examination, objections to title defects, and cure, paragraph 8(b) of the Contract provided as follows:
(b) Title Examination: Buyer will examine the title evidence and deliver written notice to Seller, within 5 days from receipt of title evidence but no later than closing, of any defects that make the title unmarketable. Seller will have 30 days from receipt of Buyer's notice of defects ("Curative Period") to cure the defects at Seller's expense. If Seller cures the defects within the Curative Period, Seller will deliver written notice to Buyer and the parties will close the transaction on Closing Date or within 10 days from Buyer's receipt of Seller's notice if Closing Date has passed. If Seller is unable to cure the defects within the Curative Period, Seller will deliver written notice to Buyer *287 and Buyer will, within 10 days from receipt of Seller's notice, either cancel this Contract or accept title with existing defects and close the transaction.
Such provisions for a buyer's written notice of title defects and a seller's opportunity to cure are common features of real estate contracts in Florida. See, e.g., Jones v. Warmack, 967 So.2d 400, 401-02 (Fla. 1st DCA 2007) (interpreting a similar contract provision); see also J. Richard Harris & Kevin M. Rys, Basic Agreement, in Florida Real Property Sales Transactions §§ 3.32-.33, .36 (Fla. Bar CLE 4th ed. 2004) (discussing the delivery of title evidence to the buyer, the buyer's notice of defects, the seller's opportunity to cure defects, and providing a contract form provision). The Contract provides further that it constitutes the entire agreement between the parties and that "[m]odifications of this Contract will not be binding unless in writing, signed and delivered by the party to be bound."
The property had previously been used as a phosphate strip-mine. After the Seller acquired the property in 1996, it undertook reclamation efforts. The reclamation process was substantially completed when the parties entered into the contract. However, the property was subject to two mortgages in favor of the Trustees of the Internal Improvement Fund (the TIIF mortgages). The TIIF mortgages had been recorded by the Florida Department of Environmental Protection (DEP) as security for the completion of the reclamation process.
Lakeland Granite selected a local attorney, Stephen H. Artman, to act as the closing agent and title agent for the transaction. As closing agent, Mr. Artman held the Buyers' $10,000 deposit in his trust account. Mr. Artman did not have an attorney-client relationship with either the Buyers or the Seller. In fact, each of the Buyers was represented by local counsel. Lakeland Granite was represented by Richard A. Miller. TJS was represented by Christopher M. Fear, but Mr. Fear was authorized to act on behalf of both TJS and Lakeland Granite. House counsel handled matters pertaining to the Contract for the Seller.
Shortly before the July 25, 2003, closing date designated in the Contract, Mr. Artman obtained a title search report for the property.[4] In addition to the TIIF mortgages, the title search report reflected an easement in favor of Polk County, certain reservations, and a long-term ground lease. Mr. Artman faxed a copy of the title search report to Mr. Fear on July 24. Afterward, in July and August, Mr. Fear and Mr. Miller informed Mr. Artman of their objections to several of the encumbrances on the property, including the TIIF mortgages. The trial court found that Mr. Artman had "communicated these objections to [the Seller], either orally or by facsimile copy."
On July 26, 2003, the Seller and Lakeland Granite executed an addendum to the Contract. This first addendum extended the Contract and the closing date for thirty days and rescheduled the closing for on or before August 25, 2003. After the execution of this first addendum, the parties realized that addressing the title issues *288 especially obtaining releases of the TIIF mortgageswould take substantially longer than they had originally anticipated. Thus the parties executed a second addendum to the Contract providing for a further extension. The second addendum was dated September 15, 2003. The provisions of the second addendum would become a focus of the litigation that ensued between the Seller and the Buyers.
The second addendum to the Contract was relatively brief. It provided as follows:
1. All Parties have been advised that a title search and examination has revealed discrepancies and encumbrances which currently render Seller's title to the subject property unmarketable.
2. All Parties have been advised that additional time will be required in order to obtain corrective instruments necessary to correct the title problems. Accordingly, both Parties agree as follows:
A. All Parties acknowledge and reaffirm that they still intend to be bound by the Contract for Sale and Purchase dated March 5, 2003 (hereinafter the "Contract").
B. All Parties agree that the Contract shall be extended for five (5) additional successive periods of thirty (30) days each. During this time, the Contract shall automatically renew every thirty (30) days until such time as it is closed or a maximum period of 150 days has elapsed.
3. All other terms and conditions of the Contract remain unchanged.
Thus the second addendum extended the Contract for five additional successive periods of thirty days each, effectively extending the expiration date of the Contract to February 15, 2004.[5]
Mr. Artman sent the title commitment to the Buyers on September 11, 2003.[6] Shortly thereafter, the parties executed the second addendum. The recitals in the second addendum reflected at least a general awareness by all parties that "a title search and examination has revealed discrepancies and encumbrances which currently render Seller's title to the subject property unmarketable." Notably, after their receipt of the title commitment, neither Mr. Fear nor Mr. Miller ever sent the Seller a written notice outlining the defects that they claimed rendered the title unmarketable. Likewise, the Seller never sent written notice to the Buyers or their attorneys of its inability to cure any of the "discrepancies and encumbrances" that the Buyers deemed objectionable.
Meanwhile, efforts to cure the title defectsparticularly obtaining releases of the TIIF mortgagescontinued. Most of this work was done by Mr. Fear. By December 2003, Mr. Fear anticipated that it would take several more months to obtain the releases of the TIIF mortgages from DEP. Thus, on December 17, 2003, Mr. Fear wrote to Mr. Artman and proposed that clearing up matters pertaining to the TIIF mortgages would be the Seller's *289 postclosing obligation, "with the Seller and Buyer entering into an Escrow Agreement with an escrow of $100,000 to secure the Seller's performance of the obligation." In addition, Mr. Fear proposed an amendment to the Contract to extend the closing date to March 15, 2004. The Seller never agreed to this proposal.
On January 5, 2004, Mr. Artman sent the Seller a proposed addendum to the Contract that would have extended it for five additional successive periods of thirty days each. Mr. Artman explained in his letter that "the [B]uyers are requesting additional time in which to complete" the ongoing efforts to secure the approval and permitting from the Southwest Florida Water Management District. Such approval and permitting was a prerequisite to obtaining releases of the TIIF mortgages. The Seller did not agree to this proposal.
On February 15, 2004, the drop-dead date fixed in the second addendum expired without either party taking steps to close the Contract. Nevertheless, on March 5, 2004, Derrell Riley, one of the Seller's representatives, wrote to Mr. Artman in response to his letter of January 5, 2004. In pertinent part, Mr. Riley's letter said:
[The Seller] will grant an extension of sixty (60) business days only commencing March 8th, 2004[,] and ending May 28th, 2004. If this transaction is not closed by the end of the extension term allotted, the original Contract for Sale and Purchase and previous bid will be null and void.
. . . .
If your client[7] is in agreement, please prepare a simple 60[-]day extension and send it to me for signatures.
On March 8, 2004, Mr. Artman responded by sending Mr. Riley a proposed third addendum to the Contract providing for an additional extension. The Seller found some of the details of this proposal to be objectionable. The trial court subsequently found that the exchange of proposals between Mr. Riley and Mr. Artman did not constitute an agreement to extend the closing date beyond February 15, 2004.
On March 12, 2004, Mr. Fear sent Mr. Riley a letter with yet another proposed amendment to the Contract. Mr. Fear's proposal called for a closing date no later than May 11, 2004, and imposed various postclosing obligations on the Seller. In addition, the proposal provided that the Seller would place $100,000 from the closing proceeds in escrow as security for the performance of its postclosing obligations. On April 9, 2004, the Seller wrote Mr. Fear acknowledging "receipt of your letter dated March 12, 2004[,] enclosing a proposed Second Amendment to that Contract dated March 1, 2003."[8] The Seller's letter continued, "Your counteroffer is rejected."
The Buyers subsequently dropped their demand for the $100,000 escrow requirement, and they notified the Seller that they were ready, willing, and able to proceed with the closing. However, at that point, the Seller was not willing to close the transaction. These events set the stage for the lawsuit that followed.

The Proceedings in the Trial Court
On May 20, 2004, the Buyers filed a complaint seeking both damages and specific *290 performance against the Seller.[9] At a bench trial conducted approximately two years after the Buyers had filed suit, the focus of the parties' presentations was on whether the Contract had been extended beyond the drop-dead date of February 15, 2004, that had been fixed in the second addendum. For example, the Buyers' trial memorandum advised the trial court that "[t]he over-arching issue in this case is whether the Contract had expired on or before April 9, 2004[,] when [the Seller] terminated its performance." The Buyers argued that the March 5, 2004, letter written by Derrell Riley of the Seller to Mr. Artman and Mr. Artman's March 8, 2004, reply amounted to an agreement to extend the closing date for sixty business days commencing March 8, 2004, and ending May 28, 2004. In response, the Seller contended that this exchange of correspondence did not constitute yet another agreement to extend the closing date. In the Seller's view, Mr. Artman's reply was not an acceptance of the Seller's request for a "simple 60[-]day extension." Instead, the Seller argued that Mr. Artman's proposed Third Addendum to the Contract providing for an additional extension was a counteroffer that added additional terms. The Seller asserted that it had rejected this "counteroffer."
After hearing the evidence and arguments, the trial court had a different perspective on the legal issues determining the outcome of the case.[10] The trial court agreed with the Seller's contention that there had been no agreement to extend the closing date beyond February 15, 2004. Despite this finding, the trial court decided that the Seller had breached the Contract and was obligated to perform. The trial court's decision was based on two legal conclusions. First, the trial court interpreted the second addendum to the Contract as relieving the Buyers of their contractual duty to provide written notice of title defects upon receipt of the title commitment. In the trial court's view, the second addendum amounted to an acknowledgment that all parties were aware of the title defects that required correction, and it triggered the Seller's duty either to cure the defects or to provide written notice of its inability to cure. Second, the trial court considered the Seller's omission to send notice of its inability to cure the title defects as obligating it to convey marketable title to the Buyers on the drop-dead date of February 15, 2004. Under the trial court's analysis, when the transaction failed to close on that date, the Seller was in breach of the Contract.
The trial court's two critical rulings appear in the following portions of the final judgment:
8. The [second a]ddendum constitutes an acknowledgment by the parties [that] there were title defects rendering title unmarketable and that additional time was required to cure those defects. The [second] addendum also constituted an amendment to the Contract which made unnecessary, or eliminated, the contractual requirement that the Buyer[s] provide the Seller with written notice of any defects that made title unmarketable. The parties were aware of the title defects which rendered title unmarketable.
. . . .

*291 10. On January 5, 2004, [Mr.] Artman corresponded with [the Seller] and, in addition to generally summarizing activities undertaken by the Buyers to remedy title defects, requested an extension of the closing date in order to obtain additional time to cure title defects. The [Seller] did not respond to this request by the February 15, 2004[,] closing date nor did it inform the Buyers, in writing, pursuant to Paragraph 8(b) of the Contract, that it was unable to cure the title defects. The contract did not close on February 15, 2004. Accordingly, the [Seller] was in breach of contract as of that date.
Based on these conclusions of law, the trial court ruled that the Buyers were entitled to specific performance of the Contract.[11]

Discussion
On appeal, the Seller's arguments address three different aspects of the trial court's ruling: (1) the construction of the Contract, (2) the issues relating to performance and breach, and (3) the appropriate remedy. On the contract construction issue, the Seller argues that the trial court erred in interpreting the second addendum's recitals as amending the Contract so that the Buyers' obligation to give written notice of title defects was eliminated, but the Seller's obligation to respond in writing was retained. With respect to the issues of performance and breach, the Seller contends that the trial court erred in finding it to be in breach when the Buyers never tendered the purchase money. Finally, the Seller maintains that the Contract's default clause precludes an award of specific performance when the Seller fails to make title marketable.[12] After a thorough review of all three issues, we conclude that we need only discuss the issue relating to performance and breach of the Contract.
Whether or not the trial court's construction of the Contract was correct, the issues relating to performance and breach are dispositive of this case. Accordingly, we may assumewithout decidingthat the second addendum amended the Contract so that the Buyers were not required to give the Seller written notice of title defects. From this assumption, it follows that the Seller omitted to give the Buyers the requisite notice of its inability to cure the title defects on or before February 15, 2004. Even so, the Buyers were not entitled to specific performance because they did not tender the purchase price to the Seller before the Contract expired.
Based on the trial court's construction of the Contract, the Seller, having failed to give the Buyers written notice of its inability to obtain releases of the TIIF mortgages and to cure the other title defects, was obligated to convey marketable title to the Buyers on or before February 15, 2004. The trial court's remedy for the Seller's failure to do so was to order the Seller to "take such action and execute and deliver such documents . . . as may be reasonably necessary to facilitate the delivery of marketable title at closing." But *292 the Contract called for concurrent performances by the parties. Thus the Seller could not be in breach of the Contract and obligated to convey title absent a tender of payment by the Buyers. Where, as here, the deed is to be delivered upon payment of the purchase price, "`an actual tender and demand by one party is absolutely necessary to put the other in default and to cut off his right to treat the agreement as still subsisting.'" Booth v. Bobbitt, 94 Fla. 704, 114 So. 513, 514 (1927) (quoting John N. Pomeroy, A Treatise on the Specific Performance of Contracts § 361 (John N. Pomeroy, Jr. & John C. Mann, eds., 3d ed. 1926)).
The trial court made no finding of tender, and the Buyers do not claim that they made a tender of payment to the Seller on or before February 15, 2004. In fact, the closing agent never had more than the $10,000 deposit in his trust account. Furthermore, the trial court did not find that a tender by the Buyers was excused by the Seller's prior repudiation of the Contract, and such a finding would not have been supported by the evidence. Cf. Kaplan v. Laratte, 944 So.2d 1074, 1075 (Fla. 4th DCA 2006) (finding that a buyer's duty to make deposits due under two real estate contracts was excused where the seller repudiated the contracts when the buyer still had time to make the deposits). Here, the Contract providedin bold printthat "[t]ime is of the essence for all provisions of this Contract." Consequently, in the absence of the Buyers' tender of the purchase price on or before February 15, 2004, the Seller never became obligated to convey title before the Contract expired. See Vance v. Roberts, 96 Fla. 379, 118 So. 205, 208 (1928); Robinson v. Abreu, 345 So.2d 404, 405 (Fla. 2d DCA 1977); Arvesu v. Blancom Props., N.V., 913 So.2d 1231, 1232 (Fla. 3d DCA 2005); Garcia v. Alfonso, 490 So.2d 130, 131 (Fla. 3d DCA 1986); Hooper v. Breneman, 417 So.2d 315, 317 (Fla. 5th DCA 1982); Emery v. Milton, 378 So.2d 1300, 1301 (Fla. 3d DCA 1979).

Conclusion
For these reasons, the trial court erred in ordering specific performance of the Contract in favor of the Buyers. We reverse the final judgment for specific performance, and we remand for the entry of a final judgment in favor of the Seller.
Reversed and remanded with instructions.
KELLY and VILLANTI, JJ., Concur.
NOTES
[1] The Contract was on a preprinted form issued by the Florida Association of Realtors. The form bears the designation "VAC-6 10/00."
[2] After the execution of the Contract, a survey disclosed that the property included 478 acres.
[3] The "time is of the essence" provision appears in bold print.
[4] The title search report named the Seller as the apparent owner of the property and listed the TIIF mortgages and other matters affecting the title to the property. However, the title search report was prepared for Mr. Artman's use in evaluating and determining the insurability of the title to the property prior to the issuance of title insurance. Thus the title search report was only preliminary information; it was not the title commitment that the Seller was required to furnish to the Buyers under paragraphs 5(c) and 8(a) of the Contract.
[5] In fact, a 150-day extension would have extended the Contract to February 12, 2004, not February 15. Moreover, February 15, 2004, fell on a Sunday. Under the Contract, for any deadline falling on a Saturday, Sunday, or national legal holiday, performance would have been due on the next business day. However, the parties and the trial court treated the Contract as if it had been extended to February 15, 2004. For the purposes of our analysis, this discrepancy of three or four days is not material. Therefore, we will use February 15, 2004, as the expiration date of the Contract fixed in the second addendum.
[6] The title commitmentunlike the title search reportwas the evidence of title that the Seller was contractually obligated to provide to the Buyers.
[7] The reference in Mr. Riley's letter to "your client" reflects a misunderstanding of Mr. Artman's role. As noted above, Mr. Artman was selected to serve as the closing agent and title agent for the transaction. He was not the attorney for any of the parties.
[8] If the parties had executed this document, it would have constituted the third amendment or addendum to the Contract, not the second.
[9] At the conclusion of the trial, the Buyers elected the remedy of specific performance.
[10] On announcing his ruling orally, the trial judge said: "But, here's the point that I'm surprised neither one of you tried to argue with me at all. And nobody seemed to  and who knows maybe because I'm looking at this thing differently."
[11] The trial court's final judgment contains detailed findings of fact and conclusions of law. These findings of fact and conclusions of law have facilitated this court's review of this case.
[12] In pertinent part, the Contract's default clause provides:

Default: (a) Seller Default: If for any reason other than failure of Seller to make Seller's title marketable after diligent effort, Seller fails, refuses or neglects to perform this Contract, Buyer may choose to receive a return of Buyer's deposit without waiving the right to seek damages or to seek specific performance as per Paragraph 16.